The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 28, 2021

## 2021COA8

**No. 19CA1636** *Defend Colorado v. Governor Jared Polis* —
**Public Health and Environment — Air Quality Control
Commission — Clean Air Act — National Ambient Air Quality
Standards**

This appeal concerns a certification of the completeness and

accuracy of air quality data — specifically, ozone levels recorded in

the Denver Metropolitan/North Front Range area — that Colorado

must annually submit to the United States Environmental

Protection Agency (EPA).  A division of the court of appeals

concludes that

- the Colorado Air Quality Control Commission (Commission)

    does not have the authority to require that the certification

    include supplemental information intended to show the

    influence of emissions from foreign countries and

    "exceptional" events such as forest fires on recorded ozone

levels;

- the Commission is not required to hold a public hearing before either (1) the submission of the certification to the EPA or (2) the withdrawal of a request to the EPA for an extension of a deadline to attain the national ambient air quality standards; and

- the district court did not err in dismissing certain claims by Defend Colorado without first receiving and considering the entire certified administrative record.

The division therefore affirms the district court's judgment dismissing Defend Colorado's claims against the Commission and Governor Jared Polis for lack of standing and failure to state a claim on which relief can be granted.

Court of Appeals No. 19CA1636
City and County of Denver District Court No. 19CV31577
Honorable Brian R. Whitney, Judge

Defend Colorado, a Colorado nonprofit association,

Plaintiff-Appellant,

v.

Governor Jared Polis and The Colorado Air Quality Control Commission,

Defendants-Appellees.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE YUN
Furman and Harris, JJ., concur

Announced January 28, 2021

Greenberg Traurig, LLP, Paul M. Seby, Matt Tieslau, Denver, Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Leeann Morrill, First Assistant Attorney General, Denver, Colorado, for Defendant-Appellee Governor Jared Polis

Philip J. Weiser, Attorney General, Thomas A. Roan, First Assistant Attorney General, Robyn L. Wille, Senior Assistant Attorney General, Denver, Colorado, for Defendant-Appellee The Colorado Air Quality Control Commission

¶ 1    This case concerns a certification of air quality data —
specifically, ozone levels recorded in the Denver Metropolitan/North
Front Range area — that Colorado must annually submit to the
United States Environmental Protection Agency (EPA).  The central
question is whether the Colorado Air Quality Control Commission
(Commission) has the authority to require that the certification
include supplemental information intended to show the EPA that
the recorded ozone levels would have been lower if not for emissions
from foreign countries and "exceptional" events such as forest fires.

¶ 2    Based on our review of the statutory and regulatory scheme
governing the certification, we conclude, as a matter of first
impression, that the Commission does not have such authority.  We
therefore affirm the district court's judgment dismissing Defend
Colorado's claims against the Commission and Governor Jared Polis
for lack of standing and failure to state a claim on which relief can
be granted.

## I.    Background

¶ 3    We first briefly describe the parties and the statutory and
regulatory background, then describe the procedural history of this
case.

## A. Parties

¶ 4 Defend Colorado is a nonprofit organization whose members include Colorado businesses and industry groups subject to regulation under the Clean Air Act, 42 U.S.C. §§ 7401-7671, and the Colorado Air Pollution Prevention and Control Act, §§ 25-7-101 to -1309, C.R.S. 2020 (Colorado Air Act). Defend Colorado states that one of its primary purposes is "to advocate for policies and regulations that align with the statutory mandates of the Colorado Air Act and the Clean Air Act."

¶ 5 The Governor is the head of the executive branch. Colo. Const. art. IV, § 2. As such, the Governor is vested with authority and control over the Colorado Department of Public Health and Environment (CDPHE) and its subdivision, the Air Pollution Control Division (Division). *See* §§ 24-1-119, 24-1-105(4), 25-1-102(1), 25-1-106, C.R.S. 2020. The Division's responsibilities include collecting data to determine the nature and quality of existing ambient air throughout the state, § 25-7-111(2)(b), C.R.S. 2020, and administering and enforcing the air quality control programs adopted by the Commission, § 25-7-111(1).

2

¶ 6 The Commission is a governmental agency within the CDPHE. § 25-7-104, C.R.S. 2020. It consists of nine Colorado citizens, *id.*, and is tasked with promulgating rules and regulations under the Colorado Air Act, including, but not limited to, a comprehensive state implementation plan to ensure attainment and maintenance of the national ambient air quality standards and to prevent significant deterioration of air quality, § 25-7-105(1)(a)(I), C.R.S. 2020. The Commission "exercise[s] its prescribed statutory powers, duties, and functions . . . independently of the head of the [CDPHE]" and, therefore, of the Governor. § 24-1-105(1); *see also* § 25-7-125, C.R.S. 2020.

B. The National Ambient Air Quality Standards

¶ 7 Under section 108 of the Clean Air Act, 42 U.S.C. § 7408(a)(1)(A), the EPA must identify and list air pollutants "emissions of which . . . cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare." Section 109, 42 U.S.C. § 7409, directs the EPA to propose and promulgate national ambient air quality standards (NAAQS) for pollutants, including ozone, listed under section 108. The air

quality standard relevant to this case is the 2008 ozone NAAQS. 73 Fed. Reg. 16,436 (Mar. 27, 2008).

¶ 8     The EPA determines whether an area attains the ozone NAAQS based on the area's "design value" — that is, the three-year average of the annual fourth-highest daily maximum eight-hour average ozone concentrations. 40 C.F.R. § 50.15(b) (2021). An area with a design value above the NAAQS is designated as being in "nonattainment" and given an "attainment date" by which it must attain the NAAQS. 42 U.S.C. §§ 7407(d), 7511(a)(1). Depending on how much the ozone levels in a nonattainment area exceed the NAAQS, the EPA classifies the area as being in marginal, moderate, serious, severe, or extreme nonattainment. 42 U.S.C. § 7511(a)(1). When an area fails to attain the NAAQS by its attainment date, the EPA may reclassify the area to the next higher classification of nonattainment. 42 U.S.C. § 7511(b)(2).

¶ 9     A state may avoid reclassification of a nonattainment area to a higher classification of nonattainment if it can demonstrate to the EPA that the area would have met the NAAQS "but for" the effect of emissions emanating from outside the United States. 42 U.S.C. § 7509a(b). Similarly, if the ozone levels in an area exceed the

4

NAAQS due to "exceptional" events such as forest fires, then the state may request mitigation for the exceedance in future determinations or designations. 40 C.F.R. § 50.14(c) (2021).

### C. The May Data Certification

¶ 10 Each year, a state must submit quarterly data of recorded levels of ozone at all monitoring stations to the EPA's computerized system for the storing and reporting of information relating to ambient air quality data. 40 C.F.R. § 58.16 (2021).

¶ 11 Further, by May 1 of each year, a state monitoring agency, through its head official or his or her designee, must submit to the EPA an "annual air monitoring data certification letter" certifying "that the previous year of ambient concentration and quality assurance data are completely submitted to [the EPA's computerized system] and that the ambient concentration data are accurate to the best of her or his knowledge, taking into consideration the quality assurance findings." 40 C.F.R. § 58.15(a) (2021). We refer to this annual letter as the "May Data Certification."

## D.    The Nonattainment Area

¶ 12    In 2016, the EPA classified the Denver Metropolitan/North Front Range area (Nonattainment Area) as being in moderate nonattainment for the 2008 ozone NAAQS and imposed an attainment date of July 20, 2018.  81 Fed. Reg. 26,697 (May 4, 2016).

¶ 13    In June 2018, the CDPHE requested a one-year extension of the attainment date.  In a proposed rule, the EPA proposed to approve the request.  83 Fed. Reg. 56,781 (Nov. 14, 2018).  However, in March 2019, the Governor issued a letter to the EPA withdrawing the extension request.  Thus, the Nonattainment Area's attainment date remained July 20, 2018.  84 Fed. Reg. 70,897 (Dec. 26, 2019).

¶ 14    In December 2019, based on ozone monitoring data showing that the design value for the Nonattainment Area exceeded the 2008 ozone NAAQS for the period 2015 to 2017, the EPA published a final rule reclassifying the Nonattainment Area from moderate to serious nonattainment, effective January 27, 2020.  84 Fed. Reg. 70,897 (Dec. 26, 2019).

## E.    Procedural History

¶ 15    In February 2019, Defend Colorado petitioned the Commission to hold one or more public hearings to "investigate and quantify the . . . effects of international emissions and exceptional events on ozone concentrations" in the Nonattainment Area in 2018 and "[i]ssue a Declaratory Order at the conclusion of such investigations . . . directing" the CDPHE to demonstrate to the EPA in the 2019 May Data Certification that, but for the effect of international emissions and exceptional events, the Nonattainment Area attained the 2008 ozone NAAQS in 2018.  Because, at the time Defend Colorado filed its petition, the Governor had not yet withdrawn Colorado's request that the EPA extend the attainment date to July 2019, Defend Colorado believed that the EPA would consider 2018 data in determining whether to reclassify the Nonattainment Area from moderate to serious nonattainment. Thus, Defend Colorado asserted that the failure to present the EPA with information regarding international emissions and emissions from exceptional events in 2018 would "result in EPA [reclassifying] the [Nonattainment] Area to 'serious' nonattainment, and the

7

imposition of extremely burdensome and costly requirements on Coloradans."

¶ 16    The Commission declined to decide the petition.  Citing section 24-4-105(11), C.R.S. 2020, the Commission concluded that it had discretion to issue declaratory orders terminating controversies or removing uncertainties "as to the applicability to the petitioners of any statutory provision or of any rule or order of the agency." Because Defend Colorado's petition did not identify any controversy or uncertainty as to the applicability to Defend Colorado of any statute, rule, or order, the Commission held that Defend Colorado lacked standing to petition for a declaratory order.  Defend Colorado submitted an emergency motion for reconsideration or clarification of the Commission's order.  In its order denying Defend Colorado's motion to reconsider, the Commission clarified that, "[b]ecause Defend Colorado does not have standing to request a declaratory order, holding a hearing to determine whether to issue such an order is illogical."

¶ 17    Defend Colorado brought a complaint in the district court for declaratory and injunctive relief and judicial review under the Colorado Administrative Procedure Act, §§ 24-4-101 to -204, C.R.S.

2020 (Colorado APA), against the Commission and the Governor. In its complaint, Defend Colorado asserted four claims for relief:

- In its first claim for relief against the Commission, Defend Colorado asserted that the Commission was required to hold a hearing "on the contents and basis" of the 2019 May Data Certification and that, if the 2019 May Data Certification was submitted to the EPA without the Commission first holding a hearing, then it was invalid and must be set aside.

- In its second claim for relief against the Commission, Defend Colorado asserted that any May Data Certification that did not include a demonstration of the effects of international emissions and exceptional events could not be characterized as accurate and must be deemed invalid and set aside.

- In its third claim for relief, against both the Commission and the Governor, Defend Colorado asserted that, while the Commission was considering Defend Colorado's petition, the Governor improperly attempted to influence the Commission; that the Commission "acquiesce[d]" to

the Governor's influence; and that, therefore, both the Governor and the Commission violated the separation of powers required by Article III of the Colorado Constitution.

- In its fourth claim for relief, against the Governor alone, Defend Colorado asserted that the Governor's letter to the EPA withdrawing Colorado's request for an extension of the Nonattainment Area's attainment date "was a usurpation of the Commission's statutory duty and authority" and therefore invalid.

¶ 18 The Commission moved to dismiss the first, second, and third claims, and the Governor moved to dismiss the third and fourth claims. After reviewing the pleadings, the district court concluded the following:

- Under 40 C.F.R. § 58.15, the May Data Certification is only a statement from the state monitoring agency that the previous year's data is accurate and precise and a summary report of the data. The May Data Certification is not the vehicle for submitting a demonstration regarding international emissions or exceptional events.

- The Commission does not "have any statutory or regulatory involvement in the creation, transmission, ratification, or manipulation of the [May Data Certification] at all."  Rather, the May Data Certification is "a ministerial function of [the] CDPHE."

- Because the petition asked the Commission to do something it could not do — that is, to exercise "oversight authority concerning" the May Data Certification — Defend Colorado suffered no injury to a legally protected right.

- It was legally impossible for the Governor to improperly influence the Commission in its decision to deny Defend Colorado's petition.  Further, the complaint contained no factual allegations suggesting that the Governor influenced the Commission in its decision.

- As a ministerial duty of the CDPHE, the May Data Certification "is in the province of the Governor's executive function."  Thus, the Governor's actions did not violate the separation of powers because "the actions were direct powers granted to the Governor."

11

- Accordingly, Defend Colorado did not have standing to assert its first and second claims, and its third and fourth claims failed to state a claim on which relief could be granted.

¶ 19　Defend Colorado now appeals.

## II.　Analysis

¶ 20　Defend Colorado contends that the district court erred by (1) dismissing its first and second claims under C.R.C.P. 12(b)(1) for lack of standing; (2) dismissing its third and fourth claims under C.R.C.P. 12(b)(5) for failure to state a claim on which relief can be granted; and (3) dismissing its claims without first having received and considered the entire certified administrative record.  We disagree with each of these contentions.

### A.　First and Second Claims

¶ 21　We begin with our analysis of whether the district court erred by dismissing Defend Colorado's first and second claims against the Commission for lack of standing.

#### 1.　Standard of Review

¶ 22　We review the issue of standing de novo.  *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004).

## 2. Standing

¶ 23 To establish standing, a plaintiff must satisfy two criteria: first, the plaintiff must have suffered an injury-in-fact, and second, the injury must have been to a legally protected interest. *Id.* Under the first prong, the injury may be tangible, such as physical damage or economic harm, or it may be intangible, such as the deprivation of a legally created right. *Id.* at 856. The second prong of the standing test "requires that the plaintiff have a legal interest protecting against the alleged injury. This is a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Id.* (citation omitted).

¶ 24 The district court concluded that Defend Colorado has no legally protected interest in the Commission's holding a public hearing on the 2019 May Data Certification because the Commission has no "statutory or regulatory involvement in the creation, transmission, ratification, or manipulation of the [May Data Certification] at all." Rather, the court found, the May Data Certification is a ministerial function of the CDPHE, regarding which the Commission has no oversight authority. Even if the

13

Commission held a hearing, the court reasoned, it could not grant the relief Defend Colorado sought — issuing a declaratory order to the CDPHE dictating the contents of the May Data Certification — and thus Defend Colorado had no legally protected interest in the hearing. "Because the petition was requesting the Commission to do something it could not even if granted," the court concluded, "Defend Colorado cannot now claim it has lost a right by having the Commission deny that same petition without [a] hearing."

### 3. Discussion

¶ 25 Defend Colorado asserts that it has standing because (1) the 2019 May Data Certification was "incomplete and inaccurate" without information regarding emissions from international sources and exceptional events; (2) the Commission has oversight authority over all of Colorado's obligations under the Colorado Air Act; and (3) the Commission was required to hold a public hearing before the May Data Certification was submitted to the EPA. We address each of these contentions in turn.

#### i. The 2019 May Data Certification

¶ 26 Defend Colorado argues that, without a demonstration of the effect of emissions from international sources and exceptional

14

events, the 2018 data certified by the 2019 May Data Certification was "incomplete and inaccurate." However, the May Data Certification is simply a certification that Colorado is accurately reporting the ozone values recorded at the monitors, after the monitored data undergoes quality assurance. 40 C.F.R. § 58.15 states as follows:

> (a) The state, or where appropriate local, agency shall submit to the EPA Regional Administrator an annual air monitoring data certification letter to certify data collected . . . from January 1 to December 31 of the previous year. The head official in each monitoring agency, or his or her designee, shall certify that the previous year of ambient concentration and quality assurance data are completely submitted to [the EPA's computerized system] and that the ambient concentration data are accurate to the best of her or his knowledge, taking into consideration the quality assurance findings. The annual data certification letter is due by May 1 of each year.

> (b) Along with each certification letter, the state shall submit to the Regional Administrator an annual summary report of all the ambient air quality data collected . . . . The annual report(s) shall be submitted for data collected from January 1 to December 31 of the previous year. The annual summary serves as the record of the specific data that is the object of the certification letter.

> (c) Along with each certification letter, the state shall submit to the Regional Administrator a summary of the precision and accuracy data for all ambient air quality data collected . . . . The summary of precision and accuracy shall be submitted for data collected from January 1 to December 31 of the previous year.

The regulation does not, by its plain language, require the May Data Certification to address or consider the originating sources of the ozone measured at the monitors.

¶ 27 Moreover, the May Data Certification is not the proper mechanism for requesting exclusion of ozone monitoring data influenced by exceptional events or submitting a demonstration that a nonattainment area would have attained the NAAQS but for emissions from international sources. A state requesting that the EPA exclude air quality monitoring data influenced by exceptional events from use in determinations of exceedances or violations of the NAAQS must notify the EPA of its intent to request data exclusion by creating an initial event description, flagging the associated data in the EPA's computerized database, and engaging in the "Initial Notification of Potential Exceptional Event" process as outlined in 40 C.F.R. § 50.14(c)(2). *See* 42 U.S.C. § 7619(b); 40 C.F.R. § 50.14(c). For data that may affect an anticipated

16

regulatory determination, the EPA must respond to a state's Initial Notification of Potential Exceptional Event with a due date for submitting a demonstration to justify the exclusion of data. 40 C.F.R. § 50.14(c)(2)(i)(B), (c)(3)(i).  Thus, the process for requesting the exclusion of data influenced by exceptional events is governed by a separate federal regulation and proceeds separately from the May Data Certification.

¶ 28     Similarly, under section 179B of the Clean Air Act, 42 U.S.C. § 7509a, titled "International border areas," a state can avoid reclassification of a nonattainment area to the next higher classification of nonattainment if it can demonstrate to the EPA that the area *would* have attained the ozone NAAQS by the applicable attainment date "but for" the effect of emissions emanating from outside the United States.  42 U.S.C. § 7509a(b).[1] In December 2020, in order to "help air agencies better understand how to satisfy

---

[1] The EPA's longstanding view is that 42 U.S.C. § 7509a(b) contains an erroneous reference to 42 U.S.C. § 7511(a)(2) and that Congress actually intended to refer to section 42 U.S.C. § 7511(b)(2).  *See* State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990, 57 Fed. Reg. 13,498, 13,569 n.41 (Apr. 16, 1992).

the requirements of [Clean Air Act] section 179B," the EPA finalized a guidance document on the preparation of demonstrations for nonattainment areas affected by international emissions. *See* Air Quality Pol'y Div., U.S. Env't Prot. Agency, *Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions* 1 (Dec. 2020), https//perma.cc/8FJY-Q776 (179B Guidance). The 179B Guidance states that, notwithstanding the title "International border areas," the EPA will accept demonstrations of the effects of international emissions on nonattainment areas that are not adjacent to an international border. 179B Guidance at 5.[2] The 179B Guidance details the process for preparing and submitting such demonstrations and states that, "to ensure the integrity of air quality data used in demonstrations, EPA recommends that [an] air agency submit a final retrospective demonstration [of the effects of international emissions] *only after* all air quality data used to calculate the

---

[2] At the time the 179B Guidance was finalized, the EPA had never acted on such a demonstration for any nonattainment area not located on the border between the United States and Mexico. 179B Guidance at 5 n.12.

attainment year design value are certified." 179B Guidance at 16 (emphasis added). Thus, the process for submitting a demonstration of the effects of international emissions also proceeds separately from the May Data Certification.

### ii. Statutory Authority

¶ 29    Defend Colorado argues that the Colorado Air Act designates the Commission as the sole state agency responsible for *all* of Colorado's obligations under the Clean Air Act, including the May Data Certification. Defend Colorado bases its argument on section 25-7-124(1), C.R.S. 2020, of the Colorado Air Act, which provides that "[t]he [C]ommission shall serve as the state agency for all purposes of the federal [Clean Air Act]." Defend Colorado argues that "[t]he term *all purposes* is clear, and does not provide room for interpretation." Thus, in Defend Colorado's view, "the Commission, *not CDPHE* . . . is the sole state actor that *must* be submitting Colorado's annual [May Data Certifications] to EPA."

¶ 30    However, Defend Colorado's reliance on the phrase "for all purposes" in section 25-7-124(1) overlooks more specific grants of authority in other parts of the Colorado Air Act and federal regulations.

¶ 31     First, 40 C.F.R. § 58.15, which sets out the requirements for the May Data Certification, provides that "[t]he head official in each monitoring agency, or his or her designee," shall submit the May Data Certification.  40 C.F.R. § 58.1 (2021) defines "[m]onitoring agency" as "a state, local or tribal agency responsible for meeting the requirements of this part," where "this part" refers to 40 C.F.R., Part 58, entitled Ambient Air Quality Surveillance.  Under section 25-7-111(2) of the Colorado Air Act, the Division is the state agency responsible for collecting and evaluating air quality monitoring data.  *See* § 25-7-111(2)(b) (giving the Division the power to "[c]ollect data, by means of field studies and air monitoring conducted by the [D]ivision or by individual stationary sources or individual indirect air pollution sources, and determine the nature and quality of existing ambient air throughout the state").  Thus, the Colorado Air Act allocates responsibility to the Division to handle air quality monitoring and to submit the May Data Certification.

¶ 32     Second, though Defend Colorado asserts that the term "all purposes" does not leave room for interpretation, it does not explain how section 25-7-124(1) should be read together with other specific statutory delegations of authority to the Division.  For example, the

20

Colorado Air Act provides that the Division shall administer and enforce the air quality control programs adopted by the Commission, § 25-7-111(1); administer permit programs under the Clean Air Act, § 25-7-114.5, C.R.S. 2020; and enforce compliance with the requirements of the state implementation plan, § 25-7-115(1)(a), C.R.S. 2020. In construing a statute, we endeavor to effectuate the purpose of the legislative scheme and to read that scheme as a whole, giving "consistent, harmonious, and sensible effect to all of its parts." *Thompson v. People*, 2020 CO 72, ¶ 22. In doing so, we interpret a specific provision as an exception to a general provision, "carving out a special niche from the general rules to accommodate a specific circumstance." *Martin v. People*, 27 P.3d 846, 852 (Colo. 2001). Thus, we conclude that the specific provision making the Division responsible for handling air quality monitoring — and, by extension, for submitting the May Data Certification — is an exception to the general provision stating that the Commission serves as the state agency "for all purposes" of the Clean Air Act. *See* § 25-7-111(2)(b); 40 C.F.R. §§ 58.1, 58.15.

¶ 33 Accordingly, we, like the district court, reject Defend Colorado's contention that the Commission has a statutory duty to

oversee Colorado's May Data Certifications to the EPA. Therefore, because the Commission could not grant the relief sought in Defend Colorado's petition, we conclude that Defend Colorado suffered no injury to a legally protected interest and thus does not have standing to assert its first two claims.

### iii. Hearing

¶ 34 Defend Colorado further argues that the Commission was required to hold a public hearing before the May Data Certification was submitted to the EPA. Defend Colorado bases this argument on two provisions of the Colorado Air Act.

¶ 35 First, Defend Colorado argues that the Commission was required to hold a public hearing because section 25-7-110(1), C.R.S. 2020, provides that the Commission shall conduct a public hearing as provided in section 24-4-103, C.R.S. 2020, "[p]rior to adopting, promulgating, amending, or modifying any ambient air quality standard . . . or any emission control regulation . . . or any other regulatory plans or programs." But the May Data Certification is not (1) an ambient air quality standard; (2) an emission control regulation; or (3) a regulatory plan or program. Rather, it is a certification that the previous year's ambient

concentration and quality assurance data were completely and accurately submitted to the EPA. 40 C.F.R. § 58.15. Further, the hearing provided for in section 24-4-103 is a rulemaking hearing, and the May Data Certification does not involve rulemaking.

¶ 36    Second, Defend Colorado argues that the Commission was required to hold a public hearing because section 25-7-124(3) provides that no agreement between the CDPHE and the EPA "involving, authorizing, or requiring compliance in this state with any ambient air quality standard or emission control regulation" will be effective "unless or until the [C]ommission has held a hearing with respect to such standard or regulation and has adopted the same in compliance with section 25-7-110," C.R.S. 2020. The district court concluded, and we agree, that attempting to characterize the May Data Certification as an agreement with the EPA is incorrect because an agreement requires input from both parties. *See* Black's Law Dictionary (11th ed. 2019) (defining "agreement" as "[a] mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons"). In contrast, the May Data Certification is, in the

23

district court's words, "a one-directional assertion by Colorado verifying [its] data." Further, section 25-7-124(3) does not require that the Commission approve the "agreement" itself but rather requires a rulemaking hearing at which the Commission would adopt the standard or regulation with which the agreement requires compliance. Thus, it is inapplicable here.

¶ 37 For the foregoing reasons, we conclude that, with respect to its first two claims, Defend Colorado suffered no injury to a legally protected interest and the district court did not err by dismissing these claims under C.R.C.P. 12(b)(1).

## B. Third and Fourth Claims

¶ 38 We next turn to Defend Colorado's contention that the district court erred by dismissing its third claim against the Governor and the Commission and its fourth claim against the Governor for failure to state a claim on which relief can be granted.

### 1. Standard of Review

¶ 39 We review a district court's ruling on a motion to dismiss under C.R.C.P. 12(b)(5) de novo. *Moss v. Bd. of Cnty. Comm'rs*, 2015 COA 35, ¶ 13. We must accept all allegations of material fact as true and view the allegations in the complaint in the light most

favorable to the plaintiff. *Id.* However, we are not required to accept as true legal conclusions that are couched as factual allegations. *Denver Post Corp. v. Ritter*, 255 P.3d 1083, 1088 (Colo. 2011). A complaint may be dismissed if the substantive law does not support the claims asserted. *W. Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1158 (Colo. App. 2008).

### 2. Discussion

¶ 40 In its third claim for relief, Defend Colorado asserts that the Governor improperly influenced the Commission in its decision to deny Defend Colorado's petition and that the Commission acquiesced to the Governor's influence. We conclude that the district court properly dismissed Defend Colorado's third claim against the Governor and the Commission for two reasons.

¶ 41 First, because, as discussed above, we conclude that the Commission has no oversight role regarding the May Data Certification, we agree with the district court that no action taken by the Governor concerning the May Data Certification could influence "a body that has no participation in its origin, content, or issuance." Thus, as a matter of law, no claim can lie against the Governor for interfering with the Commission or against the

25

Commission for acquiescing to the Governor's interference under these circumstances when the Commission has no role in the May Data Certification.

¶ 42    Second, Defend Colorado's complaint suffers from a dearth of factual allegations about how the Governor improperly influenced the Commission's actions or decisions, and the conclusory allegations it does contain are insufficient to rise above a purely speculative level. *See Warne v. Hall*, 2016 CO 50, ¶ 24 (adopting the plausibility standard articulated by the United States Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), under which a complaint must contain factual allegations sufficient to raise a right to relief above the speculative level). Defend Colorado contends that the Governor "improperly and unilaterally attempted to influence the Commission's statutory duties to administer the Colorado Air Act" and that the Commission "acquiesce[d]" to the Governor's "improper influence over what should have been an impartial decision" on Defend Colorado's petition, but none of its factual allegations explain *how* the Governor improperly influenced the Commission. Rather, Defend Colorado points to media reports of the Governor's

26

public statements.  The district court concluded, and we agree, that "[n]othing in the complaint suggests that the Governor influenced or didn't influence" the Commission in its decision not to hold the hearing and issue the declaratory order requested by Defend Colorado, "just that the Governor's actions happened contemporaneously.  This is not enough to state a claim for either undue influence or a violation of the separation of powers."

¶ 43    In its fourth claim for relief, Defend Colorado asserts that the Governor usurped the Commission's authority by withdrawing Colorado's request for an extension of the Nonattainment Area's attainment date without the Commission's holding a hearing.  In support of its argument, Defend Colorado again relies on section 25-7-124(3), which provides that no agreement between the CDPHE and the EPA "involving, authorizing, or requiring compliance in this state with any ambient air quality standard or emission control regulation" will be effective "unless or until the [C]ommission has held a hearing with respect to such standard or regulation and has adopted the same in compliance with section 25-7-110."  Defend Colorado argues that the withdrawal of the extension request was

an agreement with the EPA and that the Commission was therefore required to hold a hearing before the withdrawal was made.

¶ 44    However, even assuming that the withdrawal of the extension request was an agreement with the EPA, it did not involve, authorize, or require compliance with any ambient air quality standard or emission control regulation.  The Governor's letter merely stated that its intention was to notify the EPA of Colorado's request to withdraw its request to extend the Nonattainment Area's attainment date.  There is simply no "standard or regulation" in the letter for the Commission to "adopt[] . . . in compliance with section 25-7-110."  Thus, we conclude that no hearing was required under section 25-7-124(3).

¶ 45    For the foregoing reasons, we conclude that the district court did not err in dismissing Defend Colorado's third and fourth claims for relief because the substantive law does not support those claims.  *See W. Innovations,* 187 P.3d at 1158.

### C.    Administrative Record

¶ 46    We next address Defend Colorado's final contention that the district court erred by dismissing its first, second, and third claims

without first receiving and considering the entire certified administrative record.

### 1.    Standard of Review

¶ 47    We review the interpretation of statutes and the construction of rules of procedure de novo.  *McIntire v. Trammell Crow, Inc.*, 172 P.3d 977, 979 (Colo. App. 2007); *People v. Davis*, 2012 COA 14, ¶ 6.

### 2.    Law

¶ 48    The Colorado APA provides that, in reviewing agency action, a court "shall review the whole record or portions of the record cited by any party."  § 24-4-106(7)(c), C.R.S. 2020.  It is the plaintiff's responsibility to "designate the relevant parts of [the] record and advance the cost therefor."  § 24-4-106(6).

¶ 49    C.R.C.P. 57, which governs declaratory judgments, provides that "[w]hen a proceeding under this Rule involves the determination of an issue of fact, such issues may be tried and determined in the same manner as issues of facts are tried and determined in other actions in the court in which the proceeding is pending."  C.R.C.P. 57(i).

¶ 50    C.R.C.P. 106(a)(4)(I) provides that, in any civil matter, when any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, "[r]eview shall be limited to a determination of whether the body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer." The date for filing the record "shall be after the date upon which an answer to the complaint must be filed." C.R.C.P. 106(a)(4)(III).

### a.    Standing

¶ 51    Defend Colorado argues that whether its claims were brought under section 24-4-106 or C.R.C.P. 57, the district court could not rule on the question of standing without the full administrative record. We disagree.

¶ 52    Standing is a threshold jurisdictional question that must be determined before a case may be decided on the merits. *Ainscough,* 90 P.3d at 855. To establish standing, a plaintiff must demonstrate (1) that it has suffered an injury-in-fact; and (2) that the injury was to a legally protected interest. *Id.* Neither element, however, requires a court to review the full administrative record. Instead, as

30

discussed above, Defend Colorado's standing turns on the interpretation of various statutes and regulations.  Accordingly, the administrative record was unnecessary to resolve whether Defend Colorado has standing.

¶ 53    Furthermore, Defend Colorado's reliance on *Massachusetts Department of Public Welfare v. Secretary of Agriculture*, 984 F.2d 514 (1st Cir. 1993), and *Colorado Ground Water Commission v. Eagle Peak Farms, Ltd.*, 919 P.2d 212 (Colo. 1996), is misplaced. First, *Massachusetts Department of Public Welfare* was an appeal from an order granting summary judgment, and in that case, the court held that "the real question is . . . whether the administrative record . . . reflects a sufficient dispute concerning the factual predicate on which [the agency] relied . . . to support a finding that the agency acted arbitrarily or capriciously."  984 F.2d at 525.  In contrast, the district court's ruling on standing in this case did not turn on a matter of disputed fact, but a question of law.  Second, *Colorado Ground Water Commission* held that agency rulemaking is reviewed for reasonableness in light of the administrative record. 919 P.2d at 217.  Again, in contrast, this case does not concern agency rulemaking.  Thus, Defend Colorado provided no authority

requiring a court to review the entire administrative record before deciding a threshold standing issue.

¶ 54    We therefore conclude that the district court did not err by dismissing Defend Colorado's first and second claims without considering the entire certified administrative record.

### b.    Failure to State a Claim

¶ 55    Defend Colorado concedes that the district court did not need the administrative record to resolve its fourth claim — challenging the withdrawal of the request for the attainment date extension.

¶ 56    As to its third claim — the Governor's alleged interference in the Commission's consideration of its petition — Defend Colorado asks us to follow *Atieh v. Riordan*, 727 F.3d 73 (1st Cir. 2013), which held that "[t]he relevant inquiry [in judicial review of final agency decisions under the Federal Administrative Procedure Act] is . . . not whether the facts set forth in a complaint state a plausible claim but, rather, whether the administrative record sufficiently supports the agency's decision." *Id.* at 76.  However, the *Atieh* court expressly limited its own holding and acknowledged that a motion to dismiss for failure to state a claim can be appropriate "where the agency claims that the underlying premise of the

complaint is legally flawed (rather than factually unsupported)." *Id.* at 76 n.4. Further, in this case, the district court dismissed Defend Colorado's third claim under C.R.C.P. 12(b)(5) after noting that the claim was brought under C.R.C.P. 57 or C.R.C.P. 106, not the Colorado APA. Thus, *Atieh* has no persuasive value when reviewing the district court's dismissal of the third claim because it did not involve the Colorado APA.

¶ 57 Defend Colorado also argues that the district court was required to consider the full administrative record under C.R.C.P. 57 because its third claim depended on facts "inextricabl[y] intertwined into the administrative record for the Commission's consideration" of its petition. However, as discussed above, Defend Colorado's third claim contained no more than speculative and conclusory allegations, and the question of the sufficiency of the claim was one of law, not one of fact. *See Warne*, ¶ 19 (acknowledging that the plausibility standard may result in "weeding out groundless complaints at the pleading stage").

¶ 58 Finally, the plain language of C.R.C.P. 106(a)(4)(III) requires certification of the record only "after the date upon which an answer to the complaint must be filed." Here, no answer date was

established below because the Commission and the Governor filed

C.R.C.P. 12(b) motions to dismiss. *See* C.R.C.P. 106(a)(4)(II) ("An

answer or other responsive pleading shall then be filed in

accordance with the Colorado Rules of Civil Procedure.").

¶ 59    Accordingly, we conclude that the district court did not err by

dismissing Defend Colorado's third claim without the entire certified

administrative record.

### III.   Conclusion

¶ 60    The judgment is affirmed.

JUDGE FURMAN and JUDGE HARRIS concur.